IN THE UNITED STATES DISTRICT COURT FOR THE
MIDDLE DISTRICT OF TENNESSEE
NASHVILLE DIVISION


CHRISTOPHER LARS LOFGREN, )
)
      Plaintiff, )     NO. 3:16-cv-02811
)      JUDGE RICHARDSON
v. )
)
POLARIS INDUSTRIES INC., )
)
      Defendant.

## **MEMORANDUM OPINION**

Defendant has filed a motion to dismiss under 12(b)(1) for lack of subject-matter jurisdiction (Doc. No. 165, "Motion"). Plaintiff has filed a response (Doc. No. 174, "Response"), and Defendant has filed a reply (Doc. No. 177).[1] For the reasons discussed, Defendant's Motion to Dismiss will be denied.

---

[1] Plaintiff complains that Defendant has waited until this juncture in the litigation to raise justiciability concerns. (Doc. No. 174 at 11). However, courts have often dismissed, as premature, a party's assertion of the applicability of the political question doctrine in similar contexts when defenses are uncertain and discovery has not been completed, so the Court does not look unfavorably upon Defendant's choice to raise this issue when it did rather than earlier. *See e.g.*, *Lane v. Halliburton*, 529 F.3d 548, 554 (5th Cir. 2008); *Getz v. Boeing Co.*, No. CV 07-6396 CW, 2008 WL 2705099, at *9 (N.D. Cal. July 8, 2008). The case before this Court contains a thorough record, and discovery has been completed.

## FACTUAL BACKGROUND[2]

On June 30, 2015, Plaintiff, a West Point cadet in training with the United States Army at Fort Campbell in Tennessee, was involved in an accident while operating a MRZR-4 Lightweight Tactical All-Terrain Vehicle ("MRZR"). (Doc. No. 180 ¶ 1).[3] On the day of the accident, Plaintiff began vehicle "familiarization" on the sniper range following basic driver training. (*Id.* at ¶ 56). The sniper range was used for training because the trails normally used were temporarily closed. (*Id.* at ¶ 57). The sniper range is over 1,000 feet long and contains large dirt berms at 100-meter intervals. (*Id.* at ¶ 3). The tops of the berms are roughly level, but the ground slopes downwards, causing variance in the heights of the berms. (*Id.* at ¶ 4).

During the familiarization process, Chief Warrant Officer Fuchs drove a lap around the sniper range with Plaintiff and Cadet Truax as passengers, heading north along a gravel path to the top of the range, before turning south and carefully navigating the berms. (*Id.* at ¶ 58). During this drive, Fuchs never caused the MRZR's wheels to leave the ground, and he did not travel over the speed of around 25 to 30 miles per hour. (*Id.* at ¶ 59; Doc. No. 186 ¶ 129). Fuchs then exited the

---

[2] Unless otherwise noted, the facts in this section are taken from facts in the Complaint that are not disputed and Plaintiff's Response to Statements of Undisputed Facts and Defendant's Response to Statements of Undisputed Facts (where the facts are undisputed). (Doc. Nos. 1, 180, 186). Though the Court herein is ruling on the Motion to Dismiss and not the pending Motion for Summary Judgment (Doc. No. 164), the Court has referred herein to the parties' statements of undisputed fact and other documents in the record when discussing the facts in this opinion. Though the Court references the statements of undisputed fact filed with the Motion for Summary Judgment, the Court looks at these facts pursuant to the standard discussed below when considering a facial attack on jurisdiction via a 12(b)(1) motion. However, the Court notes that even if it accepted the facts to be what Defendant claims them to be, the Court would not conclude that the facts warrant application of the political question doctrine.

[3] The Court notes that most of the documents in this case were filed, and remain, under seal. The sealing shall be deemed lifted by virtue of this memorandum opinion only to the extent that particular information therein has been referred to herein.

MRZR, allowed Plaintiff to take over as the driver, and told Plaintiff to "take it easy." (Doc. No. 180 at ¶ 60). Cadet Truax moved to occupy the front-passenger seat. (*Id.* at ¶ 61).

After taking over the driver's role, Plaintiff drove north, made a U-turn beyond the 200-meter berm, and then came to a stop. (*Id.* at ¶ 63). Plaintiff accelerated, the MRZR lost contact with the ground, and when it landed both seat bases had broken in a similar location.[4] (*Id.* at ¶¶ 64, 65). As a result of the accident, Plaintiff suffered a spinal injury and is a paraplegic. (Doc. No. 1 at 1). Cadet Truax, who was in the MRZR with Plaintiff, was uninjured. (Doc. No. 180 at ¶ 8).

## CLAIMS AND DEFENSES

Plaintiff's Complaint pleads counts of 1) negligence, 2) strict liability, 3) breach of warranty, and 4) a constitutional challenge to Tennessee laws limiting punitive damages. (Doc. No. 1). Plaintiff requests relief in the form of compensatory and punitive damages. (*Id.* at 26).

In its brief in support of its Motion, Defendant claims that this Court lacks subject-matter jurisdiction under the political question doctrine based on two defenses it plans to assert: 1) the United States Special Operations Command ("USSOCOM")[5] improperly trained and supervised Plaintiff on the day of the incident, and 2) MRZR's design, including the decision to include the tactical seats, was done at the request and under the specific direction of USSOCOM. (Doc. No.

_____

[4] Plaintiff and Defendant dispute how the accident occurred. Defendant claims that Plaintiff accelerated to 40 miles per hour and launched the MRZR into the air, causing all four wheels to leave the ground. (Doc. No. 64 ¶ 64, 65). Plaintiff disputes that his speed reached 40 miles per hour and characterizes the vehicle leaving the ground as "inadvertent[ ]." (*Id.*). Regardless of the exact disputed circumstances, it is undisputed that the MRZR left the ground and the seat bases were thereafter broken in similar locations.

[5] In their briefing, the parties use both USSOCOM and SOCOM to reference the United States Special Operations Command. For consistency, the Court herein uses use the abbreviation USSOCOM.

170 at 16). According to Defendant, the nature of these defenses is such that they necessarily trigger the political question doctrine

In order to properly assess its first defense, Defendant asserts, the Court and jury will have to review various military decisions, including the decisions to: "(1) let Plaintiff operate the MRZR before completing the Army's MRZR training program; (2) permit Chief Fuchs to supervise Plaintiff despite having no MRZR training or experience; (3) allow vehicle-familiarization training to proceed when the dedicated training course was closed; (4) allow untrained and unsupervised personnel to drive the MRZR on a sniper range that had never before been used for MRZR training and that featured a series of 12-foot jumps; (5) allow Plaintiff to operate the vehicle in violation of the Army's express speed restrictions; and (6) let Plaintiff operate the MRZR without in-vehicle supervision." (Doc. No. 177 at 2, 4-5).

In making the second determination, Defendant claims, the jury will have to review military decisions regarding the design of the MRZR. (Doc. No. 170 at 2-4). Defendant asserts that: the military was involved in the design process of the MRZR; the military specifically exerted design control over the seat; USSOCOM tested the MRZR and issued a document imposing safe operation limits; USSOCOM specifically addressed speed limits and did not conduct any jump testing; and USSOCOM additionally adopted Defendant's owner's manual. (*Id.* at 2-7).

## LEGAL STANDARD

Rule 12(b)(1) "provides for the dismissal of an action for lack of subject matter jurisdiction." *Cartwright v. Garner*, 751 F.3d 752, 759 (6th Cir. 2014). "Subject matter jurisdiction is always a threshold determination." *Am. Telecom Co. v. Republic of Lebanon*, 501 F.3d 534, 537 (6th Cir. 2007).

There are two types of motions to dismiss for lack of subject-matter jurisdiction: facial and factual attacks. *Gentek Bldg. Products, Inc. v. Sherman-Williams Co.*, 491 F.3d 320, 330 (6th Cir. 2007). A facial attack questions merely the sufficiency of the pleading. When reviewing a facial attack, a district court takes the allegations in the complaint as true. *Id.* If those allegations establish federally-cognizable claims, jurisdiction exists. *Id.* A factual attack instead raises a factual controversy concerning whether subject-matter jurisdiction exists. *Id.*

Where there is a factual attack on the subject-matter jurisdiction of the court under Fed. R. Civ. P. 12(b)(1), no presumptive truthfulness applies to the complaint's allegations; instead, the court must weigh the conflicting evidence to arrive at the factual predicate that subject-matter jurisdiction does or does not exist. *Gentek Bldg. Products, Inc.*, 491 F.3d at 330. "[T]he district court has considerable discretion in devising procedures for resolving questions going to subject matter jurisdiction[.]" *Ohio Nat. Life Ins. Co. v. United States*, 922 F.2d 320, 327 (6th Cir. 1990). The Sixth Circuit has noted that:

> The factual attack, however, differs greatly for here the trial court may proceed as it never could under 12(b)(6) or Fed. R. Civ. Pro. 56. Because at issue in a factual 12(b)(1) motion is the trial court's jurisdiction—its very power to hear the case— there is substantial authority that the trial court is free to weigh the evidence and satisfy itself as to the existence of its power to hear the case. In short, no presumptive truthfulness attaches to plaintiff's allegations, and the existence of disputed material facts will not preclude the trial court from evaluating for itself the merits of jurisdictional claims.

*RMI Titanium Co. v. Westinghouse Elec. Corp.*, 78 F.3d 1125, 1134 (6th Cir. 1996) (quoting *Mortensen v. First Fed. Sav. & Loan Ass'n*, 549 F.2d 884, 890 (3d Cir. 1977)).

In making its decision, the district court has wide discretion to allow affidavits, documents, and even a limited evidentiary hearing to resolve jurisdictional facts.[6] *Gentek Bldg. Products, Inc.*,

---

[6] Neither party has requested an evidentiary hearing or pointed the Court to additional evidence they might submit at such a hearing. The Court therefore exercises its discretion to rule on the

491 F.3d at 330; *see also Nichols v. Muskingum Coll.*, 318 F.3d 674, 677 (6th Cir. 2003) ("In reviewing a 12(b)(1) motion, the court may consider evidence outside the pleadings to resolve factual disputes concerning jurisdiction, and both parties are free to supplement the record by affidavits."); *Cunningham v. Rapid Response Monitoring Servs., Inc.*, 251 F. Supp. 3d 1187, 1192 (M.D. Tenn. 2017) (discussing *Gentek*). As always, the party invoking federal jurisdiction has the burden to prove that jurisdiction. *Global Technology, Inc. v. Yubei (XinXiang) Power Steering Sys. Co.*, 807 F.3d 806, 810 (6th Cir. 2015); *Golden v. Gorno Bros.*, 410 F.3d 879, 881 (6th Cir. 2005).

Defendant here lodges a factual attack on subject matter jurisdiction. This is a factual attack because its success or failure hinges on the factual validity of the Complaint's allegations. Therefore, the Court will exercise its discretion to resolve the Motion by reference to the record outside of Plaintiff's Complaint.

---

present Motion without an evidentiary hearing. *See e.g.*, *Ohio Nat. Life Ins. Co. v. United States*, 922 F.2d 320, 327 (6th Cir. 1990).

## DISCUSSION[7]

The political question doctrine entails that the presence of a "political question" will deprive a federal court of jurisdiction. *Marbury v. Madison*, 5 U.S. 137, 170 (1803) ("Questions, in their nature political, or which are, by the constitution and laws, submitted to the executive, can never be made in this court."). "The political question doctrine excludes from judicial review those controversies which revolve around policy choices and value determinations constitutionally committed for resolution to the halls of Congress or the confines of the Executive Branch. The Judiciary is particularly ill suited to make such decisions, as 'courts are fundamentally

---

[7] Plaintiff argues that Defendant's invocation of the political question doctrine is merely an attempt to rehash the arguments in Defendant's summary judgment motion regarding the general contractor defense. (Doc. No. 174 at 14). Plaintiff cites *Norwood v. Raytheon Co.* for the proposition that a military-related products liability claim should not be dismissed under the political question doctrine, because if the military's decision to acquire a certain product and produce regulations for its use was a political question, all products liability claims by military members injured by a defective product would be barred. (*Id.*). The Court disagrees with this reading of *Norwood*. There, the court said:

> As for Plaintiffs' claims stemming from exposure to Defendants' radars during service in the United States military, the very existence of the government contractor defense in federal common law demonstrates that claims by United States servicemen against military contractors are not necessarily barred by the political question doctrine. The government contractor defense allows a court to consider claims brought against military contractors, while still preventing the court from scrutinizing the exercise of discretion by government officers in the selection of the appropriate design for military equipment to be used by our Armed Forces.

*Norwood v. Raytheon Co.*, 455 F. Supp. 2d 597, 603 (W.D. Tex. 2006) (citation and internal quotation marks omitted). Essentially, the Court in *Norwood* was using the existence of the government contractor defense as evidence that claims by soldiers against contractors are not "necessarily barred by the political question doctrine." *Id.* This does not imply that the political question doctrine could *never* be used in such a case, just that it does not *automatically* apply in such a case. The Court additionally notes that courts have regularly considered both the political question doctrine and the general contractor defense when both are raised by a defendant. *See e.g.*, *Carpenter v. Sikorsky Aircraft Corp.*, 101 F. Supp. 3d 911 (C.D. Cal. 2015); *Rodriguez v. Gen. Dynamics Armament & Tech. Prod., Inc.*, 696 F. Supp. 2d 1163 (D. Haw. 2010); *Bentzlin v. Hughes Aircraft Co.*, 833 F. Supp. 1486 (C.D. Cal. 1993).

underequipped to formulate national policies or develop standards for matters not legal in nature.'"

*Japan Whaling Ass'n v. Am. Cetacean Soc.*, 478 U.S. 221, 230 (1986) (citation omitted).

In *Baker v. Carr*, the Supreme Court laid out "six independent tests" to determine whether a political question is present:[8]

> [1] a textually demonstrable constitutional commitment of the issue to a coordinate political department; [2] or a lack of judicially discoverable and manageable standards for resolving it; [3] or the impossibility of deciding without an initial policy determination of a kind clearly for nonjudicial discretion; [4] or the impossibility of a court's undertaking independent resolution without expressing lack of the respect due coordinate branches of government; [5] or an unusual need for unquestioning adherence to a political decision already made; [6] or the potentiality of embarrassment from multifarious pronouncements by various departments on one question.

369 U.S. 186, 217 (1962). The Supreme Court later held that "[t]hese tests are probably listed in descending order of both importance and certainty." *Vieth v. Jubelirer*, 541 U.S. 267, 278 (2004). The political question doctrine is a "narrow exception" to the general responsibility that a court has to decide cases before it. *Zivotofsky ex rel. Zivotofsky v. Clinton*, 566 U.S. 189, 194 (2012). The analysis of whether or not a political question is present requires a "discriminating inquiry

---

[8] The parties, and many other courts, characterize this quote from *Baker* as laying out six "factors" in the analysis of a potential political question. However, the Supreme Court has been clear that *Baker* presented "six independent tests" to analyze when determining whether a political question is present. *Vieth v. Jubelirer*, 541 U.S. 267, 277, 124 S. Ct. 1769, 1776, 158 L. Ed. 2d 546 (2004). The Court finds this distinction to be important. Factors indicate the balancing of multiple factors, whereas the *Baker* analysis is instead six independent (though often overlapping) tests. *Memphis A. Phillip Randolph Inst. v. Hargett*, No. 3:20-CV-00374, 2020 WL 5095459, at *3 (M.D. Tenn. Aug. 28, 2020) (Richardson, J.) (noting that the four factors of the preliminary injunction test (albeit with a twist) "are 'factors to be balanced'") (quoting *Michael v. Futhey*, No. 08-3922, 2009 WL 4981688, at *17 (6th Cir. Dec. 22, 2009))). Therefore, if any one of the six independent *Baker* tests is met, the Court should dismiss this case for lack of subject matter jurisdiction.

into the precise facts and posture of the particular case." *Baker*, 369 U.S. at 217.[9] A political

question can be raised by a defendant's defense, not just the plaintiff's complaint.[10]

The Court will discuss each *Baker* test in turn.

### 1. Has this issue been constitutionally committed to another branch of government?

Plaintiff argues that he "does not challenge any political, military or foreign policy act or

relationship, including [USSOCOM's] decision to purchase the subject MRZR from [Defendant],

---

[9] The Court notes that the United States Department of the Army is an Interested Party in this matter and has previously been active in the litigation. (*See e.g.*, Doc. Nos. 110, 134, 138). The Army has filed nothing to indicate that it believes that this case involves issues that have been committed to the executive branch. Though obviously not dispositive or exceptionally persuasive, this leans, if at all, in favor of the Court properly exercising subject-matter jurisdiction over the case before it. *See e.g.*, *McMahon v. Presidential Airways, Inc.*, 502 F.3d 1331, 1365 (11th Cir. 2007) ("[T]he United States has not intervened in the instant case, despite an invitation to do so . . . . The apparent lack of interest from the United States to this point fortifies our conclusion that the case does not yet present a political question."); *Gross v. German Found. Indus. Initiative*, 456 F.3d 363, 380 (3d Cir. 2006) (noting that the court "would expect" communication from the executive branch when political question was at issue). *Contra Alperin v. Vatican Bank*, 410 F.3d 532, 556 (9th Cir. 2005) ("It is unclear, however, how courts should construe executive silence. We are not mind readers. And, thus, we cannot discern whether the State Department's decision not to intervene is an implicit endorsement, an objection, or simple indifference. At best, this silence is a neutral factor.").

[10] Despite Plaintiff's protests, it is well established that a political question can be raised by a contractor's defense. (Doc. No. 174 at 16); *e.g.*, *Harris v. Kellogg Brown & Root Servs., Inc.*, 724 F.3d 458, 466 (3d Cir. 2013) ("In these situations, the political question appears not from the plaintiff's claims but from the broader context made relevant by a contractor's defenses."); *Lane v. Halliburton*, 529 F.3d 548, 565 (5th Cir. 2008) ("We must look beyond the complaint, considering how the Plaintiffs might prove their claims and how [Defendant] would defend."). However, it is true that courts may be more skeptical of the political question doctrine when raised in connection with a defendant's defenses than with a plaintiff's complaint. *See e.g.*, *McMahon v. Gen. Dynamics Corp.*, 933 F. Supp. 2d 682, 695 (D.N.J. 2013) ("[Defendant] states that it will defend itself in a manner that will drag the Court into exacting evaluations of the Army's policies and the actions of its soldiers. That argument is too broad; it would give defendants too much power to define the issues. Indeed, it would bar virtually any claim in which the contractor posited that the military, not itself, was at fault. In the great majority of cases dismissing claims on political question grounds, the allegedly faulty exercise of military judgment was the basis of the complaint, not of a hypothetical defense." (citation omitted)).

or its training and supervision of Plaintiff during the routine ROHVA familiarization training. Plaintiff also seeks only monetary damages as relief. Plaintiff's claims focus exclusively on [Defendant's] obligation to provide a defect-free MRZR seat base. Thus, the first *Baker* factor does not require dismissal here." (Doc. No. 174 at 16).[11] Defendant argues that, in considering its defenses, the Court will have to consider decisions made during military training, consider military design and equipment decisions, and allocate fault to the military under Tennessee law.[12] (Doc. No. 170). Defendant asserts that these evaluations would constitute an improper review of a political question by the Court.

A case evaluating military judgments typically falls under the first *Baker* test, since the Constitution vests these types of decisions in the executive branch and legislative branch. U.S. Const. art. I, § 8, cls. 11–16, art. II, § 2; *see e.g.*, *Carmichael v. Kellogg, Brown & Root Servs.,*

---

[11] Plaintiff argues that there is a lack of case law dismissing products liability actions under the political question doctrine, and that therefore the political question doctrine does not apply. (Doc. No. 174 at 10-13). In considering a similar argument, a court has previously held that even though products liability actions are often dismissed, the political question doctrine still merits consideration because of the "case by case" nature of the political question doctrine, and just because a case has not previously occurred, does not mean that it will *never* occur. *Martinez v. Sci. Applications Int'l Corp.*, No. 1:10-CV-207, 2015 WL 11109381, at *8 (S.D. Tex. June 29, 2015). Additionally, the Court notes Plaintiff's argument focuses on his own claims, when the Court can properly asses the Defendant's defenses as well as Plaintiff's claims, as previously discussed. Plaintiff similarly focuses his arguments on his own claims, and not on Defendant's defenses, in his arguments on the other *Baker* tests.

[12] The Defendant's Motion discusses the various *Baker* tests at the outset, but it does not specifically apply any of the *Baker* tests to the facts at hand. Instead, Defendant discusses the political question doctrine in a more general sense as being applicable to its defenses. The Court has extrapolated which of Defendant's arguments pair with which *Baker* tests. Although the first *Baker* test is the one most likely implicated when military judgments are at issue, *Carmichael v. Kellogg, Brown & Root Servs., Inc.*, 572 F.3d 1271, 1281 (11th Cir. 2009), any of the six *Baker* tests conceivably could apply in such an action. *Aiello v. Kellogg, Brown & Root Servs., Inc.*, 751 F. Supp. 2d 698, 705 (S.D.N.Y. 2011) (noting that the defendant had not specifically identified the *Baker* tests implicated but looking at all six nevertheless). Defendant specifically argues that the first four *Baker* tests are implicated. (Doc. No. 170 at 12-13).

*Inc.*, 572 F.3d 1271, 1281 (11th Cir. 2009); *Aktepe v. USA*, 105 F.3d 1400, 1403 (11th Cir. 1997).[13] However, "not even military judgments are completely immune from judicial review." *McMahon v. Presidential Airways, Inc.*, 502 F.3d 1331, 1358 (11th Cir. 2007) (citations omitted). And "[t]he military does not enjoy a blanket exemption from the need to proceed in a non-negligent manner." *Tiffany v. United States*, 931 F.2d 271, 280 (4th Cir. 1991).

The first *Baker* test encompasses not only suits directly against the government and military, but also some suits against military contractors. "Defense contractors do not have independent constitutional authority and are not coordinate branches of government to which we owe deference . . . Nonetheless, these suits may present nonjusticiable issues because military decisions that are textually committed to the executive sometimes lie just beneath the surface of the case." *Harris v. Kellogg Brown & Root Servs., Inc.*, 724 F.3d 458, 465 (3d Cir. 2013) (citation omitted). When a contractor, instead of the military itself, seeks to invoke the political question doctrine, that contractor bears a "double burden." *McMahon*, 502 F.3d at 1359-60. Such contractor (like Defendant here) must satisfy a two-part test to establish that the political question doctrine applies: "First, it must demonstrate that the claims . . . will require reexamination of a decision by the military . . . . Then, it must demonstrate that the military decision at issue is . . . insulated from judicial review." *Id.* (citation omitted). When analyzing whether a contractor defendant's defense would implicate a political question, a court should first decide whether the defendant has presented sufficient evidence to allow a jury to conclude that the defendant has established the elements of the defense by a preponderance of the evidence, but "if there is insufficient evidence

_____

[13] The Court notes that many of the cases cited in this brief are merely persuasive authority. Courts in the Sixth Circuit have had few opportunities to address the application of the political question doctrine when decisions of the military are potentially implicated. Though there are some minor inconsistencies between circuits, the overall analysis of the political question doctrine in the military context is substantially similar across circuits.

to support the defense, or if the defense does not present a nonjusticiable issue, then the case goes forward." *Harris*, 724 F.3d at 469 (citation omitted).

The most common type of military decision that implicates the political question doctrine is a decision made during a combat situation. *See e.g.*, *Bentzlin v. Hughes Aircraft Co.*, 833 F. Supp. 1486, 1487 (C.D. Cal. 1993) (alternatively dismissing plaintiffs' negligence and strict liability claims that arose from deaths in a combat zone by allegedly defective missile under the political question doctrine); *Carmichael*, 572 F.3d at 1275, 1281-82 (dismissing the case as a political question when the military made a series of decisions regarding a convoy and "adjudicating the plaintiff's claims would require extensive reexamination and second-guessing of many sensitive judgments surrounding the conduct of a military convoy in war time—including its timing, size, configurations, speed, and force protection"); *Norwood v. Raytheon Co.*, 455 F. Supp. 2d 597, 604 (W.D. Tex. 2006) (not finding the first *Baker* test applicable and noting "any analysis by the Court of the American military's use of the radar systems would not involve inquiries into rules of engagement, reactions of United States servicemen during combat, or any information that Defendants contend is protected by the state secrets privilege."). However, a military decision need not necessarily arise during combat to implicate the political question doctrine.[14] *See e.g.*, *Tiffany v. United States*, 931 F.2d 271, 277-79 (4th Cir. 1991) (applying the

_____

[14] Plaintiff argues that most of the cases relied on by Defendant "involve negligence claims arising in a theater of war, in a combat zone, or on a battlefield, against a private contractor which was acting under the direct supervision and management of the Unites States military at the time of the incident." (Doc. No. 174 at 11); *e.g.*, *Carmichael.*, 572 F.3d at 1287 (stating that though there was not any hostile activity on the day of the accident, the road at issue was in a "combat zone" or "battlefield"); *McMahon*, 502 F.3d at 1363 n.32 (noting the prevalence of district court cases dismissing matters that arise in a combat zone). However, a cause of action does not necessarily have to arise in a traditional theater of war to be dismissed as a political question. *See e.g.*, *Carmichael*, 572 F.3d at 1287 ("The deeper problem with [plaintiff's] argument, however, is the implicit suggestion that a military decision is unreviewable only if it somehow pertains to battlefield or combat activities. While decisions relating to the latter issues are paradigmatically

political question doctrine to claims arising out of a crash that occurred when the military was responding to an unidentified civilian plane off the United States coast which had not filed a flight plan).

Training can also constitute a military decision. Courts have found decisions regarding training to implicate a political question because "developing military training procedures that will ensure the combat effectiveness of our fighting forces" is invested in the legislative and executive branches. *Aktepe*, 105 F.3d at 1403 (finding analysis of NATO training exercises beyond judicial review); *see e.g.*, *Carmichael*, 572 F.3d at 1293, 1295 (stating that negligent training and supervision claims against a private contractor implicated the political question doctrine when the employees were trained according to military standards, using military training manuals and tactics, and finding that a "negligent training claim would entail judicial scrutiny of sensitive judgments customarily entrusted to the military"); *Rodriguez v. Gen. Dynamics Armament & Tech. Prod., Inc.*, 696 F. Supp. 2d 1163, 1186 (D. Haw. 2010) (not applying political question doctrine and finding the first *Baker* test inapplicable when there was no question presented of how the army trained its soldiers or the wisdom of the government's design of a mortar shell). However, military training does not automatically invoke a political question. *Tiffany*, 931 F.2d at 280 ("When conducting training exercises, for example, or acting in a civilian arena, national defense interests may be more remote and the military faces different restrictions." (citing *Peterson v. United States*, 673 F.2d 237 (8th Cir. 1982) (not discussing the political question doctrine and allowing a

---

insulated from judicial review, it is neither necessary nor sufficient for purposes of the political question doctrine that military decisions relate to such matters." (collecting cases)); *Aktepe v. USA*, 105 F.3d 1400, 1403 (11th Cir. 1997) (finding political question when Turkish soldiers sued regarding an accident that resulted in injuries and deaths on their ship during NATO training exercises).

negligence action to go forward when the United States Air Force conducted an Operational Readiness mission simulating war-time conditions and flew too low to a farm when navigational equipment failed, scaring cows) and *Ward v. United States*, 471 F.2d 667 (3d Cir. 1973) (not discussing the political question doctrine and allowing negligence action to go forward regarding military supersonic training)).

In cases against a contractor, the military's control over the contractor's actions indicates that the case raises a political question if the contractor was essentially acting on behalf of the military. The court in *Harris* explained that:

> Military control over a contractor's actions is one common way that evaluation of strategic military decisions becomes necessary. Military control requires evaluation of military decisions because if the contractor is simply doing what the military ordered it to do, then review of the contractor's actions necessarily includes review of the military order directing the action. However, where the military does not exercise control but merely provides the contractor with general guidelines that can be satisfied at the contractor's discretion, contractor actions taken within that discretion do not necessarily implicate unreviewable military decisions.

*Harris*, 724 F.3d at 466-67 (citations omitted). In *Harris*, the court found that, because the contractor retained "significant discretion," there was no unreviewable military decision implicated. *Id.*

Additionally, the political question doctrine is less likely to be applicable when (as in the present case) a plaintiff requests solely monetary damages from a defense contractor than when the plaintiff requests injunctive relief, since a monetary remedy does not require any judicial oversight of military discretion. *Koohi v. United States*, 976 F.2d 1328, 1332 (9th Cir. 1992) ("A key element in our conclusion that the plaintiffs' action is justiciable is the fact that the plaintiffs seek only damages for their injuries. Damage actions are particularly judicially manageable. By contrast, because the framing of injunctive relief may require the courts to engage in the type of operational decision-making beyond their competence and constitutionally committed to other

branches, such suits are far more likely to implicate political questions." (citations omitted)). But the political question doctrine is not automatically inapplicable merely because the plaintiff seeks only monetary damages. *See Carmichael*, 572 F.3d at 1292 (noting in its discussion of the second *Baker* test that when a court lacks judicially manageable standards to resolve a dispute the fact that a plaintiff only seeks money damages will not save the case from dismissal). Courts have found that when a plaintiff brings tort-based compensation actions against a defense contractor, the first *Baker* test weighs in favor of judicial resolution. *Flanigan ex rel. Flanigan v. Westwind Techs., Inc.*, 648 F. Supp. 2d 994, 1000 (W.D. Tenn. 2008).

Here, Defendant claims that in evaluating its defenses, under Tennessee law,[15] the Court and jury will be forced to examine military decisions and ultimately decide whether to allocate fault to the military under Tennessee's comparative fault system. The Tennessee Supreme Court has abandoned the approach of contributory negligence and instead adopted a system of comparative fault in tort cases. *McIntyre v. Balentine*, 833 S.W.2d 52, 56 (Tenn. 1992). Under Tennessee's comparative fault system, if a plaintiff's negligence is determined to be less than the

---

[15] Under the so-called *Erie* doctrine, a federal court sitting in diversity applies the substantive law of the state in which it sits. *Erie R.R. Co. v. Tompkins*, 304 U.S. 64, 78 (1938) (holding that a federal court sitting in diversity is bound to follow the law of the forum state); *Hayes v. Equitable Energy Res. Co.*, 266 F.3d 560, 566 (6th Cir. 2001) (citing *Klaxon Co. v. Stentor Elec. Mfg. Co.*, 313 U.S. 487, 496 (1941)). Tennessee substantive law therefore governs in this Court. Part of Tennessee's substantive law for this Court to apply is Tennessee's choice-of-law rules, which theoretically could direct the Court to apply the underlying law (*i.e.*, the law excluding choice-of-law rules) of some other state. *See Standard Fire Ins. Co. v. Ford Motor Co.*, 723 F.3d 690, 692–93 (6th Cir. 2013). In briefing on the Motion for Summary Judgment, Plaintiff has indicated that he believes that Minnesota (Defendant's home state and where all relevant design decisions were made) law "could very well control." (Doc. No. 179 at 30 n.6). Despite this, neither Plaintiff nor Defendant has mentioned Minnesota law in briefing the present Motion. Though the Court will not make a determination of the state law applicable to this case at this juncture, the Court will not analyze Minnesota law as neither party has discussed it. Instead, absent a showing as to why it should do otherwise, the Court will apply the default substantive law, *i.e.*, Tennessee substantive law.

defendant's negligence, a plaintiff may recover, but their damages will be reduced in proportion to the percentage of the total negligence attributed to the plaintiff. *Id.* at 57. Additionally, Tennessee courts have found that "comparative fault principles do apply in products liability actions based on strict liability in tort." *Whitehead v. Toyota Motor Corp.*, 897 S.W.2d 684, 693 (Tenn. 1995) (finding that "a plaintiff's ability to recover in a strict products liability case should not be unaffected by the extent to which his injuries result from his own fault").

The general rule in Tennessee is that fault can be apportioned to a party who is immune from suit. *Carroll v. Whitney*, 29 S.W.3d 14, 16, 19 (Tenn. 2000) (allowing a jury to allocate 100% of the fault to resident physicians who were immune as employees of a state university and stating "we hold that when a defendant raises the nonparty defense in a negligence action, a jury may generally apportion fault to immune nonparties"). In *Harris*, the court found that if Tennessee law applied to the claim, the defendant's contributory-negligence defense would introduce a nonjusticiable issue into the case because the military's responsibility, even though the military was immune, would need to be evaluated. 724 F.3d at 477. The court found that:

> If a jurisdiction uses a proportional-liability system which assigns liability by the degree of fault, then a proximate-cause defense introduces a nonjusticiable issue. In such a system, there is simply no way to determine damages without evaluating military decisions. The fact finder cannot decide the respective degrees of fault as between a military contractor . . . and the military without evaluating the decisions made by each . . .

*Harris*, 724 F.3d at 474. The court ultimately remanded to the district court to make a choice of law decision, but it held that "if Tennessee or Texas law [as opposed to Pennsylvania law] applies, then damages cannot be estimated without evaluating unreviewable military decisions." *Id.* at 474. The Court additionally stated that even if some issues were non-justiciable, the case should be allowed to continue as to damages that did not implicate proportional liability. *Id.* Defendant relies heavily on *Harris* in its briefing. Though instructive, *Harris* does not necessarily dictate a result

in the case at hand, in part because *Harris* did not actually apply Tennessee law and ignored an important exception (discussed below) to *Carroll*'s general rule. Additionally, the Court is unconvinced that in evaluating Defendant's two defenses it will have to reexamine a decision of the military that is insulated from judicial review. *See McMahon*, 502 F.3d at 1359-60.

Defendant did not address in its briefing the exception to the general rule, presented in *Carroll*, that an immune party can be apportioned liability. The Tennessee Worker's Compensation Law provides the exclusive avenue for an employee to seek remedies under the statute, and so an employer cannot be found liable to its employees in tort. Tenn. Code Ann. § 50–6–108(a); *Liberty Mut. Ins. Co. v. Stevenson*, 212 Tenn. 178, 182, 368 S.W.2d 760, 762 (1963). Therefore, despite the general rule of *Carroll*, Tennessee courts do not apportion liability to an immune employer. The Tennessee Supreme Court has explained that:

> Of course, the employer cannot be found to be the proximate, or legal, cause of the plaintiff's injuries because the employer is immune from tort liability under Tenn. Code Ann. § 50–6–108(a). By enacting Tenn. Code Ann. § 50–6–108(a), the legislature has already determined that for policy reasons the employer may not be the legal cause of the plaintiff's injuries. This is not to say, however, that the employer cannot be found by the trier of fact to have been a cause in fact of the plaintiff's injuries. If the rule were otherwise, the defendants [non-employers of the plaintiff] would effectively be precluded from presenting a defense.

*Snyder v. LTG Lufttechnische GmbH*, 955 S.W.2d 252, 256 (Tenn. 1997).[16] In other words, the acts of an employer can be deemed the cause in fact of the injuries of its employee in a suit against

---

[16] The court in *Harris* did not discuss *Snyder* and this exception regarding an employer's liability. In a footnote, the *Harris* court did note that "[t]his conclusion depends on the ability of fact finders to assign fault to immune parties, such as the government. Both states permit this. The Tennessee Supreme Court appears to have never dealt with the assignment of fault to the government." *Harris*, 724 F.3d at 474 n.11. It appears to still be the case that Tennessee courts have not faced the issue of allocating fault to the U.S. government, but the court in *Harris* court overlooked the already then-existing exception regarding employer liability.

a third party,[17] but the employer cannot be apportioned any percentage of liability in such a suit where the third party's acts are a cause of the injuries. In *Carroll*, the Tennessee Supreme Court specifically stated that *Snyder* was not overruled and clarified that the allocation of fault[18] in worker's compensation cases would continue to be governed exclusively by Tennessee's Worker Compensation Law. *Carroll*, 29 S.W.3d at 19. The retention of the exception post-*Carroll* is motivated by a provision in Tennessee's Worker Compensation Law that entitles an employer (if it has paid its maximum liability for worker's compensation) to have a subrogation lien against its employee's recovery from a third party; this would allow the harsh result of allowing an employee's recovery to be reduced twice (once due to the apportionment of liability from the immune employer and once due to the employer's subrogation lien) if an employer could be apportioned fault.[19] *Id.*

---

[17] "While an employee cannot proceed with a tort action against the employer, the employee may seek damages from some person other than the employer." *Carroll*, 29 S.W.3d at 19 (citing § 50–6–112(a)).

[18] In this context, references to allocating "fault" and apportioning "liability" apparently are used interchangeably by courts. This practice seems to result from the close link between "fault" and "liability" as a general matter in this context. *See Carroll*, 29 S.W.3d at 20 ("[O]ur decision is also grounded in the rationale that led to the adoption of comparative fault in the first place: fairness to the parties by linking fault with liability.").

[19] The statute states: "In the event of a recovery against the third person by the worker, or by those to whom the worker's right of action survives, by judgment, settlement or otherwise, and the employer's maximum liability for workers' compensation under this chapter has been fully or partially paid and discharged, the employer shall have a subrogation lien against the recovery, and the employer may intervene in any action to protect and enforce the lien." Tenn. Code Ann. § 50-6-112. This provision of the statute has not been amended, despite an invitation to the legislature from the Tennessee Supreme Court to do so, and so this exception for employers allowing allocation of fault to immune parties remains the law in Tennessee. *Johnson v. Torrington Co.*, No. M2010-01924-COA-R3CV, 2012 WL 2337615, at *14 (Tenn. Ct. App. June 19, 2012) (discussing the history of the exception). Additionally, a plaintiff does not have to show that they actually face the risk of a subrogation lien in order for the exception to apply. *Troup v. Fischer Steel Corp.*, 236 S.W.3d 143, 149 (Tenn. 2007).

Employees of the military working on a Tennessee base such as Fort Campbell appear to be covered by Tennessee's Worker Compensation Law.[20] Plaintiff was a West Point Cadet in training with the United States Army when the accident occurred. (Doc. No. 180 at ¶ 1). However, the parties have submitted no evidence or argument to this Court that Plaintiff, a cadet, was or was not an employee and that the military or the government was or was not his employer, so as to come within the scope of the Worker's Compensation statute. In his Response, Plaintiff notes in a footnote that "[Defendant] wrongly claims that a jury can allocate fault to the military even if it is immune. *Carroll v. Whitney*, relied on by [Defendant] allowed allocation of fault to immune state employees in a medical malpractice suit. The Army, however, was Plaintiff's employer and cannot be allocated fault in a products liability suit under Tennessee law." (Doc. No. 174 at 18) (internal citations omitted). Plaintiff included no citation to the record providing the Court with evidence that Plaintiff, a West Point cadet, qualifies as an employee of the federal government (the military) under the applicable legal standard for making that determination.

Examining the issue of whether a cadet at a U.S. military academy is an "employee" of the military (albeit in contexts different than the Tennessee's Worker Compensation Law's definition), courts have provided conflicting answers to that question. *See McManus v. McCarthy*, 586 F. Supp. 302, 304 (S.D.N.Y. 1984) (finding that cadets at marine academy were "students and not salaried government workers"); *Loritts v. United States*, 489 F. Supp. 1030, 1031 (D. Mass. 1980) (calling West Point cadet who assaulted and raped a visitor to campus a "government employee"); *Whalen v. Office of Pers. Mgmt.*, 959 F.2d 924, 926-928 (Fed. Cir. 1992) (holding that a cadet-midshipman, although an employee for worker's compensation purposes under the Federal Employees

---

[20] The Worker's Compensation statute broadly defines both "employee," Tenn. Code Ann. § 50-6-102(12)(A), and "employer," *id.* at (13).

Compensation Act, is not an employee for service-credit purposes of the Civil Service Retirement Act); *Cobb v. U.S. Merch. Marine Acad.*, 592 F. Supp. 640, 643 (E.D.N.Y. 1984). ("We further hold that the complaint does not state a cause of action against the Academy under 42 U.S.C. Section 2000e–16, as plaintiff was a mere student and not an "employee" of the Academy.").

Lacking evidence from the parties, and binding (or consistent non-binding) precedent, regarding this issue, the Court declines to decide whether *Snyder* applies to the facts at hand. However, the Court finds that, even without applying the exception in *Snyder*, Defendant's defenses do not raise a political question that is exclusively in the domain of the executive branch, because the Court is unconvinced that in evaluating Defendant's two defenses it will have to 1) reexamine a decision of the military that is 2) insulated from judicial review. *McMahon*, 502 F.3d at 1359-60.

Plaintiff's Complaint alleges only state law tort claims and a challenge to the Tennessee constitution. (Doc. No. 1). On their own, Plaintiff's claims against Defendant do not invoke a political question, as they do not implicate any military action and focus solely on the Defendant's (a contractor's) actions. Plaintiff requests relief solely in the form of compensatory and punitive damages and does not seek injunctive relief. (*Id.* at 26). The fact that Plaintiff brings a tort-based lawsuit seeking a purely financial remedy leans in favor of this Court exercising subject matter jurisdiction, since tort claims seeking purely monetary damages are less likely to invoke the need to review a military decision, though this is obviously not dispositive. *See Koohi*, 976 F.2d at 1332.

The Court finds not only that Plaintiff's claims do not raise a political question, but also that Defendant's defenses do not implicate the first *Baker* test. As indicated above, Defendant claims that this Court lacks subject-matter jurisdiction under the political question doctrine in light of two defenses it plans to assert: 1) that USSOCOM improperly trained and supervised Plaintiff

on the day of the incident, and 2) that MRZR's design, including the decision to include the tactical seats, was done at the request and under the specific direction of USSOCOM. (Doc. No. 170 at 16).

In assessing the first defense, Defendant asserts, the Court and jury will have to review various military decisions related to Plaintiff's training and use of the MRZR. (Doc. No. 177 at 2, 4-5). The parties dispute whether Plaintiff received proper training on the operation of the MRZR, though it is clearly apparent from the record that Plaintiff received some level of training and instruction from the military on the operation of the MRZR. (Doc. No. 180 at ¶ 56; Doc. No. 186 at ¶¶ 124, 125, 126, 127); (Doc. 171-1 at 12) (commander who conducted the Army's investigation stated in his findings that Plaintiff possessed "adequate experience and training to operate the MRZR in a safe manner"). Defendant alleges that the circumstances and the substance of the training were improper. For example, it is undisputed that the familiarization training took place on a sniper range with berms because the trails normally used were temporarily closed and that Fuchs allowed Plaintiff to drive the MRZR without his supervision. (Doc. No. 180 at ¶¶ 56, 57, 61). Plaintiff additionally was driving the vehicle at a speed that, though disputed,[21] was undisputedly faster than the USSOCOM-recommended 20 miles per hour speed limit on a "Cross Country Road"; on the other hand, USSOCOM did not provide a recommended speed limit for a sniper range with berms. (Doc. No. 171-9 at 21).

---

[21] At the time of the accident, Defendant claims that the MRZR was travelling at 40 miles per hour, but Plaintiff claims that it was 25-30 miles per hour. (Doc. No. 180 at ¶ 64). Regardless, either would be more than the 20 miles per hour recommended for a Cross Country Road. Defendant also cites a particular report and claims that it required certain operating speeds for users, but actually the report merely notes the operating speeds to which the *testing* of the MRZR was limited. (Doc. No. 171-21 at 9); (Doc. No. 180 at ¶ 34).

The Court recognizes and has discussed the many cases that find "training," the topic implicated by Defendant's first defense, to be a matter committed to the military's decision-making. However, these cases typically involved more extreme situations than the situation at hand. The Court recognizes that a case does not have to involve events in a combat zone in order to raise a political question. But the situation at hand—a vehicle crash on American soil—suggests that review of decisions of the executive branch will necessarily be less consequential than many of the reviews discussed herein. The use of the MRZR during a training exercise is much less extreme than the training in *Carmichael*, where a private contractor was trained according to military standards and guidebooks, and the plaintiff's negligent-training claim would directly involve the judiciary in the review of a convoy during wartime. 572 F.3d at 1293, 1295. This is also much less extreme than the training in *Aktepe*, where a court did not involve itself in the wisdom of United States participation in NATO training exercises. 105 F.3d at 1403. Instead, the Court finds that the training at issue indicates that "national defense interests may be more remote." *Tiffany*, 931 F.2d at 280. The Court is unconvinced that decisions such as when to allow a cadet to drive a MRZR, where to drive that MRZR, and how to drive the MRZR would involve review of a military decision beyond this Court's proper purview.

In making the second determination, Defendant claims, the jury will have to review military decisions regarding the design of the MRZR. (Doc. No. 170 at 2-4). Defendant asserts that the MRZR was created in collaboration with USSOCOM as part of the Lightweight Tactical All-Terrain Vehicle program, through which the military had requirements that caused Defendant to reconfigure their civilian RZR; the military was involved in the design process of the MRZR; that the military specifically made requests regarding the seat design; that USSOCOM tested the MRZR and issued a document imposing safe operation limits; that USSOCOM specifically

addressed speed limits and did not conduct any jump testing; and that USSOCOM additionally adopted Defendant's owner's manual. (*Id.* at 2-7). Plaintiff disputes that the vehicle was created in close collaboration with USSOCOM. (Doc. No. 174 at 2). Instead, Plaintiff claims that the MRZR is a slightly modified version of Defendant's civilian RZR. (*Id.* at 2-3). Plaintiff states that Defendant developed the MRZR to submit in response to a request for a quotation that USSOCOM issued, rather than being approached by USSOCOM and working with USSOCOM to develop the MRZR. (*Id.* at 2-4). Plaintiff additionally argues that the USSOCOM tests were conducted only after the purchase of the MRZRs to determine whether they met particular performance requirements. (*Id.* at 5). Importantly, Plaintiff argues that USSOCOM recommended a change in the seat cushion, which was then changed back later. (*Id.* at 6).

The Court finds that the actions that Defendant claims support the application of the political question doctrine all actually show that the military was not controlling Defendant's actions, but instead making mere suggestions and requests for certain design features. Defendant has repeatedly characterized the interactions with the military as a "collaboration," and the military as having "requests." (*E.g.*, Doc. No. 170 at 2, 3, 5, 16).

Tellingly, Defendant repeatedly characterizes the seat design change as a "request," and evidence in the record indicates that the military did not exercise control over the seat design, leaving it instead to Defendant's discretion subject to the military's approval. (Doc. No. 180 at ¶¶ 19, 22, 23, 24, 25). One of Defendant's engineer's deposition indicates in several places that the military's discussions regarding the seat change design were a "request." (Doc. No. 171-12 at 44-47). Additional evidence in the record also indicates that Defendant retained discretion over the seat design, and that the seat design was similar to that offered in the RZR (the civilian version of the MRZR) with only a difference in the cushions. (Doc. No. 171-21) (labeling the "tactical seats"

addition as a "recommendation[]" and providing no instructions or demands regarding the "recommendation[]"); (Doc. No. 174-3 at 54-57) (noting that there was "no specific criteria" for the seat base design); (Doc. No. 180 at ¶ 20) (undisputed that "[t]he tactical and civilian seat assemblies contain the same components except for the seat padding"); *see also* (Doc. No. 174-8 at 195; Doc. No. 174-4 at 172). The Court in *Harris* indicated that when a military contractor is simply doing what the military ordered, review of the contractor's actions will have to include review of the military actions; however, if the military does not exercise control but instead gives the contractor "general guidelines" and "discretion," the contractor's actions within that discretion will not give rise to a political question. 724 F.3d at 466-67. The Court therefore finds that Defendant retained its discretion in the design of the MRZR, and more specifically, in the design of the seat base. Because the military did not exercise control or make decisions regarding the design, and instead offered merely suggestions, the Court does not find that to review the MRZR's design would be to act in the purview of the executive branch.

Because of the reasons discussed above, the Court finds that the first *Baker* test does not apply here in this case.

### 2. Is there a lack of judicially discoverable and manageable standards for resolving the dispute?

Plaintiff argues that the jury can assign fault to Plaintiff regarding his operation of the MRZR, without regard to the military's actions, and the sole question at issue in this case is whether Defendant defectively designed the plastic seat base. (Doc. No. 174 at 19). Defendant argues that this Court lacks standards to assess a cause of action arising out of military training and to assess military judgments generally. (Doc. No. 170 at 12, 15, 16).

Under the second *Baker* test, cases should be dismissed under the political question doctrine if the judiciary lacks standards and guidance under which it can resolve a dispute. *See*

*e.g.*, *Sadi v. Obama*, No. 15-11314, 2015 WL 3605106, at *6-7 (E.D. Mich. June 8, 2015) (dismissing action when judiciary lacked standards to assess the validity of a decision to not evacuate citizens stranded in a dangerous part of Yemen); *Zuckerbraun v. Gen. Dynamics Corp.*, 755 F. Supp. 1134, 1142 (D. Conn. 1990), *aff'd*, 935 F.2d 544 (2d Cir. 1991) (dismissing case under state secrets and political question grounds when the case would require the court to evaluate the crew's reaction to an attack on their ship in the Persian Gulf).

Because the judiciary lacks standards to resolve disputes evaluating the training and equipping of military forces, these types of cases will be deemed to raise a political question. The Supreme Court has held that

> Trained professionals, subject to the day-to-day control of the responsible civilian authorities, necessarily must make comparative judgments on the merits as to evolving methods of training, equipping, and controlling military forces with respect to their duties under the Constitution. It would be inappropriate for a district judge to undertake this responsibility in the unlikely event that he possessed requisite technical competence to do so.

*Gilligan v. Morgan*, 413 U.S. 1, 8, 93 S. Ct. 2440, 2444–45, 37 L. Ed. 2d 407 (1973); *see also*, *Aktepe v. USA*, 105 F.3d 1400, 1404 (11th Cir. 1997) ("Decisions relative to training result from a complex, subtle balancing of many technical and military considerations, including the trade-off between safety and greater combat effectiveness. Courts will often be without knowledge of the facts or standards necessary to assess the wisdom of the balance struck. More particularly, courts lack standards with which to assess whether reasonable care was taken to achieve military objectives while minimizing injury and loss of life." (citations omitted)); *Bredesen v. Rumsfeld*, 500 F. Supp. 2d 752, 763 (M.D. Tenn. 2007) (dismissing case as presenting a political question when plaintiff's claims required analysis of the realignment of a military base under the Defense Base Closure and Realignment Act of 1990, which in turn would require analysis of the alignment's impact on the "composition, training, equipping, and control of a military force");

*Carmichael*, 572 F.3d at 1294-95 (stating that negligent training and supervision claims could not go forward, due to the second *Baker* test, when the judiciary possesses "no readily available standards for assessing whether the training [private contractor employee] received was adequate to prepare him for the work he was to perform").

However, courts have been hesitant to dismiss cases under the political question doctrine when a case arises under tort law, since states generally have well-established tort and negligence frameworks that provide clear standards for resolving cases. *See e.g.*, *Bixby v. KBR, Inc.*, 748 F. Supp. 2d 1224, 1239 (D. Or. 2010) (noting that traditional tort and negligence law standards were applicable); *Rodriguez*, 696 F. Supp. 2d at 1186 (noting the applicability of negligence and strict liability standards in a case solely seeking damages); *Norwood*, 455 F. Supp. 2d at 605 ("[B]ecause the common law of tort provides clear and well-settled rules on which the district court can easily rely, this case does not require the court to render a decision in the absence of 'judicially discoverable and manageable standards.'") (quoting *Klinghoffer v. S.N.C. Achille Lauro Ed Altri–Gestione Motonave Achille Lauro in Amministrazione Straordinaria,* 937 F.2d 44, 49 (2d Cir.1991)). In making a decision in a case similar to the one before this Court, a district court explained:

> The incident at issue in this case was, essentially, a traffic accident, involving a commercial truck alleged to have been negligently maintained, as well as a civilian truck driver who was allegedly negligent in operating the truck and insufficiently trained. Claims of negligence arising from this type of incident are commonly adjudicated by courts, using well-developed judicial standards. While the actions taken by [plaintiff], a military officer, in assisting the truck will likely be relevant to causation, it is by no means clear that the policies or decisions of the military or of the executive branch itself will be implicated in this case.

*Lessin v. Kellogg Brown & Root,* No. CIVA H-05-01853, 2006 WL 3940556, at *3 (S.D. Tex. June 12, 2006) (ultimately not granting dismissal of action on political question doctrine before

discovery, but noting that defendant could renew its motion to dismiss if discovery revealed additional facts relevant to the political question doctrine).

In the training context, the court in *Aktepe* held that:

> [N]o judicially discoverable and manageable standards exist for resolving the questions raised by this suit. In order to determine whether the Navy conducted the missile firing drill in a negligent manner, a court would have to determine how a reasonable military force would have conducted the drill. As the Supreme Court noted in a related context, "it is difficult to conceive of an area of governmental activity in which the courts have less competence." *Gilligan*, 413 U.S. at 10, 93 S. Ct. at 2446. Decisions relative to training result from a complex, subtle balancing of many technical and military considerations, including the trade-off between safety and greater combat effectiveness. *See Boyle v. United Technologies Corp.*, 487 U.S. 500, 511, 108 S.Ct. 2510, 2518, 101 L.Ed.2d 442 (1988). Courts will often be without knowledge of the facts or standards necessary to assess the wisdom of the balance struck. *Rappenecker v. United States*, 509 F. Supp. 1024, 1029 (N.D. Cal.1980). More particularly, courts lack standards with which to assess whether reasonable care was taken to achieve military objectives while minimizing injury and loss of life. *See DaCosta v. Laird*, 471 F.2d 1146, 1155 (2d Cir.1973); *Rappenecker*, 509 F. Supp. at 1030.

105 F.3d at 1404. An additional concern for courts has been that, because of the nature of the military involvement, a jury would be unable to apply a "reasonable person" standard in a negligence claim. *Whitaker v. Kellogg Brown & Root, Inc.*, 444 F. Supp. 2d 1277, 1282 (M.D. Ga. 2006) ("The question here is not just what a reasonable driver would do—it is what a reasonable driver in a combat zone, subject to military regulations and orders, would do."); *Carmichael*, 572 F.3d at 1288-89 (dismissing negligence claim when the judiciary lacked standards to evaluate duty, breach, and the reaction of a reasonable person when a convoy was subject to extensive military control).

The Court believes that it has judicially manageable standards to resolve the dispute before it. This is, essentially, a tort suit under state law bringing negligence and products liability claims

that arose from a vehicular accident. (Doc. No. 1). Both of these causes of action are subject to well-developed Tennessee state law.[22]

In addition, the instance at hand lacked any of the exigent, wartime circumstances that have previously made it difficult for courts to apply a "reasonable person standard." *E.g.*, *Whitaker*, 444 F. Supp. 2d at 1282. Plaintiff was not driving the MRZR under combat conditions that would make it difficult for a jury to determine whether he acted reasonably. Instead, Plaintiff was participating in a training exercise on a sniper range with berms, without any additional pressures of war or combat—circumstances more akin to a typical off-road vehicle wreck[23] than a combat wreck. That being so, the Court perceives that a jury would be able to apply a reasonable-person standard and Tennessee tort law in this case. An alleged tort that arises from military training perhaps may raise a political question under some circumstances. *Aktepe*, 105 F.3d at 1404; *Tiffany*, 931 F.2d at 279. But the Court finds that the present circumstances are not on the level of evaluating a NATO exercise or a response to an unidentified flying aircraft as in *Aktepe* and *Tiffany*, respectively.

Therefore, the Court finds that the second *Baker* test does not apply here

---

[22] "In order to establish a prima facie claim of negligence, basically defined as the failure to exercise reasonable care, a plaintiff must establish the following essential elements: (1) a duty of care owed by defendant to plaintiff; (2) conduct below the applicable standard of care that amounts to a breach of that duty; (3) an injury or loss; (4) cause in fact; and (5) proximate, or legal, cause. *Giggers v. Memphis Hous. Auth.*, 277 S.W.3d 359, 364 (Tenn. 2009) (internal quotation marks and citations omitted). Products liability claims are governed by Tenn. Code Ann. § 29-28-101, *et seq.*

[23] In fact, there has been litigation regarding tort claims arising out of crashes and alleged defects of the RZR (the civilian version of the MRZR). *E.g.*, *Birch v. Polaris Indus., Inc.*, 812 F.3d 1238 (10th Cir. 2015); *United States v. Polaris Sales, Inc.*, No. 219CV06830ODWKSX, 2020 WL 4430375 (C.D. Cal. July 31, 2020). In one of the cases, a plaintiff drove an RZR over a berm going 30-35 miles per hour, went airborne, and suffered an injury to his spinal cord. *Thompson v. Polaris Indus. Inc.*, No. CV-16-02868-PHX-DJH, 2019 WL 2100005, at *1 (D. Ariz. May 14, 2019) (addressing only various evidentiary issues). Though *Thompson* was not heard on the merits, it indicates that courts have a clear framework for addressing similar claims in nearly identical factual situations.

**3. Is it impossible to decide this case without an initial policy determination of a kind clearly for nonjudicial discretion?[24]**

Defendant argues that military judgments "often involve policy decisions, including risk/benefit weighing, that call for the exercise of military discretion, which would be inappropriate to review in a judicial proceeding." (Doc. No. 170 at 12). Plaintiff responds that "[t]his factor does not preclude justiciability here because Plaintiff's claims against [Defendant] involve decisions separate from any military decision-making or policy determinations made by the Army. The Court and jury need only measure [Defendant's] misconduct against the Plaintiff's operation of the MRZR under state law . . . Such a straightforward examination is well within the competency of the judicial branch." (Doc. No. 174 at 19).

"Under this factor, a political question is implicated if in deciding the case, a court would have to make a policy determination of the kind appropriately reserved for diplomatic—and thus Executive—discretion." *Gross v. German Found. Indus. Initiative*, 456 F.3d 363, 388 (3d Cir. 2006). Also, "[a] political question under the third factor 'exists when, to resolve a dispute, the court must make a policy judgment of a legislative nature, rather than resolving the dispute through legal and factual analysis.'" *Id.* (quoting *EEOC v. Peabody W. Coal Co.*, 400 F.3d 774, 784 (9th Cir.2005)). Typically for this test to be implicated a court must face a clear, initial policy determination that is not suited for the judiciary. *See Norwood*, 455 F. Supp. 2d at 605–08 ("The Court understands the third *Baker* factor to require dismissal only when the claims presented would require a court to make an initial policy determination in order to decide the case."); *Aktepe*, 105 F.3d at 1404 (dismissing action where the court could not properly evaluate a policy determination that simulating actual battle conditions is necessary and noting that "[t]rained professionals,

---

[24] Though the Court can, should and will analyze this separately from the first *Baker* test, the Court notes that the two share substantial analytical overlap.

subject to the day-to-day control of the responsible civilian authorities, necessarily must make comparative judgments on the merits as to evolving methods of training, equipping, and controlling military forces with respect to their duties under the Constitution." (citation omitted)); *Flanigan ex rel. Flanigan*, 648 F. Supp. 2d at 1002–03 ("It is the position of the Defendants that, to decide the merits of the instant matter, the Court would be required to make initial policy determinations as to whether Apache pilots were sufficiently trained, sufficiently briefed on their mission and rested prior to flight. Again, the Court is not convinced at this juncture that these questions will be at issue in this case.").

This would not be the first time that the undersigned has noted that there is often a thin line between a decision that would appropriately or generally be considered a "policy" decision and one that appropriately or generally would instead be considered some other kind of decision—a "political" decision, or a "financial decision, or a "legal" decision, for example. Nevertheless, the Court stands ready to draw that line and characterize decisions accordingly. But Defendant has not identified anything that in its view is an initial policy decision that the Court would need to make in order to resolve Plaintiff's claims. Still less has Defendant identified anything that the Court would agree actually is a "policy"—rather than, say, a "legal"—decision for the Court to make, and the Court sees no likelihood of a need for any actual "policy" determination.

The Court finds that the third *Baker* test does not apply here.

### 4. Would rendering a decision in this case constitute a lack of respect for the political branches of government?

Plaintiff contends that "resolution of Plaintiff's claims would not contradict any prior decisions by [USSOCOM] and [Defendant] fails to even argue the fourth through sixth factors in its motion." (Doc. No. 174 at 20). Contrary to Plaintiff's contention, Defendant appears to address this factor, albeit tersely, when it states that "[s]ubjecting discretionary military decisions to

judicial scrutiny fails to afford the appropriate level of respect to the coordinate branches of government." (Doc. No. 170 at 13). Defendant also cites both *Aktepe* and *Tiffany* for the same principle. (*Id.* at 13, 16).[25] However, Plaintiff is correct that Defendant provides this Court with no argument regarding what, exactly, about deciding this case would reflect a lack of respect for the political branches of government. This is problematic for Defendant because it is hardly self-evident such "lack of respect"—a hazy, subjective, and ambiguous notion—would be conveyed by this Court were it to adjudicate this case.

In *Norwood*, the court did not find that the case indicated a lack of respect for the political branches of government, indicating that in that case, "Any alleged fault of the United States will be potentially implicated only by defenses that might be asserted by Defendants, and no party has argued that the United States military knew of and ignored the alleged dangers posed by the radar systems at issue." 455 F. Supp. 2d at 606. The *Norwood* court also noted that the fourth *Baker* test "appear[s] to be relevant only if judicial resolution of a question would contradict prior decisions taken by a political branch in those limited contexts where such contradiction would seriously interfere with important governmental interests." *Id.* (quoting *Kadic v. Karadzic*, 70 F.3d 232, 249 (2d Cir.1995)). However, other courts have held that "[t]he interjection of tort law into the realms of foreign policy and military affairs would effectively permit judicial reappraisal of judgments the Constitution has committed to the other branches." *Aktepe*, 105 F.3d at 1404 (citing *Tiffany*, 931 F.2d at 278).

As suggested above, the Court believes that reasonable people can disagree with one another regarding whether a particular situation involves a "lack of respect." But here, the call is

---

[25] As noted above, Defendant structured its Motion in terms of its defenses, and not as a progression through the various *Baker* tests. Defendant's quoted remark and citation of *Aktepe* and *Tiffany* appears, as far as the Court can tell, to be an intended reference to the fourth *Baker* test.

for the undersigned to make, and he calls it like he sees it: the Court's rendering a decision in this matter would not evince a "lack of respect" for other branches of government, as there is no indication that the military ignored dangers of the MRZR, and any fault of the military would be implicated only through Defendant's defenses. *See Norwood*, 455 F. Supp. 2d at 606. The Court additionally does not find that the implications of tort law in this case would permit judicial reappraisal of executive judgments, as evidenced by the Court's discussion rejecting the applicability of the first *Baker* test. Therefore, the Court is unconvinced that deciding this case would be disrespectful to the executive branch, and Defendant has given the Court no reason to think that it would.

The Court finds that the fourth *Baker* test does not apply here.

### 5. The final two *Baker* tests

The final two tests are: "[5] or an unusual need for unquestioning adherence to a political decision already made; [6] or the potentiality of embarrassment from multifarious pronouncements by various departments on one question." *Baker*, 369 U.S. at 217. The court in *Norwood* did not find that these factors applied there, stating that "[t]he fourth through sixth *Baker* factors appear to be relevant only if judicial resolution of a question would contradict prior decisions taken by a political branch in those limited contexts where such contradiction would seriously interfere with important governmental interests." 455 F. Supp. 2d at 606 (quoting *Kadic v. Karadzic*, 70 F.3d 232, 249 (2d Cir.1995)). The Court does not find that its adjudication of this case would threaten any such contradiction, and Defendant has made no argument that it would. Indeed, Defendant does not even make any argument at all that either of the final two *Baker* tests should apply here.

The Court thus finds that the final two *Baker* tests do not apply here.

## CONCLUSION

For the reasons discussed, the Court will deny Defendant's Motion.

An appropriate order will be entered.

_Eli Richardson_

ELI RICHARDSON
UNITED STATES DISTRICT JUDGE